**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **JOHN ORLANDO WALKER,** | : | |
| | : | |
| **Petitioner,** | : | |
| | : | **Civil Action** |
| **v.** | : | **No. 5:05-cv-222 (MTT)** |
| | : | |
| **DANNIE THOMPSON, WARDEN,** | : | |
| | : | **Petition for Writ of Habeas Corpus** |
| **Respondent.** | : | **28 U.S.C. § 2254** |
| _____ | : | |

## <u>RECOMMENDATION</u>

On February 9, 1998, following a six-day trial, a jury in the Superior Court of Houston County entered a verdict finding Petitioner John Walker guilty of robbery, hijacking a motor vehicle, kidnapping, and aggravated assault. Walker was sentenced to twenty years in prison for the robbery, twenty years in prison for the kidnapping, and twenty years probation for the hijacking, for a total of forty years in prison followed by twenty years probation. He remains incarcerated pursuant to this sentence.

Eighteen years later, all of his state post-conviction remedies have been fully exhausted and his case is before this Court for a final decision on his federal petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The record of delays in the state's post-conviction process is extraordinary and troubling, including over ten years to decide a motion for new trial, two years to decide a direct appeal, and three years to conduct state habeas corpus proceedings. Nevertheless, Walker has not shown that the state habeas decision was contrary to clearly established federal law or based on an unreasonable finding of fact. The record shows that Walker received a trial consistent with the requirements of constitutional due process and that he was not ultimately

1

prejudiced by the delays in his post-conviction proceedings. Accordingly, it is hereby **RECOMMENDED** that his petition for writ of habeas corpus be **DENIED**

## PROCEDURAL HISTORY

The procedural history in this case presents a record of delays at every stage of the post-conviction process. The most significant of those delays was the period of nearly eleven years from the filing of Walker's timely motion for new trial in 1998 and a final decision on the motion in 2009.

Walker first filed his federal petition in this case on July 1, 2005. On February 8, 2006, a Magistrate Judge entered a Recommendation to grant Respondent's Motion to Dismiss because Walker had not yet exhausted state remedies. (Doc. 18). The Court rejected the Recommendation and found that Walker should be excused from the requirement to exhaust based on the lengthy delays in the state's post-conviction process. (Doc. 21). At the time of the Court's Order, Walker still had a motion for new trial pending in the trial court, and had not yet filed a notice of appeal.

The Court's April 28, 2006 Order suggests that many of the delays in obtaining a ruling on the motion for new trial were the result of Walker's conduct. At the outset, there was a delay of nearly two and a half years while waiting for the court reporter to prepare a transcript of the trial. In addition, Walker had continuing disagreements with his appointed appellate counsel. His initial post-trial counsel, William Peterson, was forced to withdraw after severe health problems left him hospitalized for five months in 1999. A second attorney, Charles Taylor, was appointed to represent Walker, but withdrew shortly afterwards because of Walker's dissatisfaction with his

representation. Peterson was reappointed in 2000, but moved to withdraw after Walker filed a bar grievance against him.[1]

On October 18, 2005, the Superior Court of Houston County conducted a hearing on Walker's motion for new trial. The Court was not aware of this hearing at the time it denied Respondent's Motion to Dismiss, as Respondent did not file the transcript of this hearing (Doc. 36) until August 8, 2006. At the first motion for new trial hearing, Walker appeared without counsel. He indicated that he believed Peterson still represented him, but stated that he had not corresponded with Peterson since 2000. (Doc. 36, pp. 6, 8). The hearing was continued to allow Walker to contact Peterson.

A second hearing on the motion for new trial was conducted on May 5, 2006, at which Walker was represented by Peterson. Peterson indicated to the court that he spoke with Walker after the October 18, 2005, hearing and "patched up their differences." (Doc. 36, p. 20). The Superior Court of Houston County denied Walker's motion for new trial on June 26, 2006. (Doc. 33-5, p. 13). Walker's appellate brief to the Georgia Court of Appeals indicates that the trial court entered two further orders denying his motion for new trial, on May 23, 2007, and on July 1, 2009. (Doc. 116-1, p. 7). These orders do not appear to be in the record of this case.

While the Georgia courts were still dealing with Walker's motion or motions for new trial, this Court appointed counsel and conducted an evidentiary hearing on April 8, 2009. (Doc. 94; Transcript of Proceedings, Doc. 97). The parties filed supplemental briefs in June and July of 2009. (Docs. 101, 102). On March 11, 2010, the Court entered an Order staying the case to allow

---

[1] Walker's appellate brief to the Georgia Court of Appeals indicates that between Walker's conviction and September 18, 2007, the trial court appointed counsel for Walker on four separate occasions. Doc. 116-1, p. 6. The brief further notes that Walker "filed Grievances with the State of Georgia against every attorney assigned to his case." *Id.*

for the conclusion of Walker's state appeal. (Doc. 105). In October 2010, the Magistrate Judge, Claude W. Hicks, retired and the case was reassigned to the undersigned, then newly-appointed.

A status conference was scheduled for December 14, 2010. (Doc. 110). Counsel for Respondent indicated that Walker's appeal had been docketed in the Court of Appeals of Georgia on August 20, 2010, and that several extensions had been granted for the filing of the brief on appeal. Some delay in the appeal seems to have resulted from a protracted illness by Walker's appellate counsel, Elizabeth Lane, who had been appointed at some time prior to April 4, 2009. (See Doc. 89). In December 2010, a new appellate attorney, David Daniell, was appointed. The Court of Appeals issued an opinion affirming the conviction on June 22, 2011. See *Walker v. State*, 310 Ga. App. 223, 713 S.E.2d 413 (Ga. Ct. App. 2011).

After the Court of Appeals issued its decision, the undersigned entered a new Report and Recommendation on August 19, 2011, (Doc. 112), recommending that Walker be excused from further exhaustion of state remedies and that the petition be denied on the merits. The Court did not adopt this recommendation, but instead entered an Order on January 3, 2012, staying the case until Walker could exhaust his state habeas remedies. (Doc. 122). On January 15, 2015, Respondent notified the Court that the state habeas review had concluded and filed supplemental transcripts of the state habeas proceedings. (Doc. 127). Walker's counsel filed a supplemental brief on February 10, 2015. (Doc. 129). Walker himself filed a *pro se* brief on March 6, 2010. (Doc. 131). Respondent has not filed any supplemental brief or further argument since the conclusion of the state habeas proceeding.

## PETITIONER'S CLAIMS FOR RELIEF

Following the exhaustion of state remedies, Walker's claims for relief focus primarily on the thirteen-year delay of his appeal and on claims of ineffective assistance of appellate counsel. In

his supplemental brief, Walker contends that the length of the delay, alone, establishes "a history of ineffective assistance of counsel so long-standing and egregious that he is entitled to relief without further evidence," and that he was prejudiced by the passage of time and "the failure of counsel to promptly pursue and present facts." (Doc. 129, p. 12).

In his state habeas petition, Walker also raised various claims of ineffective assistance of appellate counsel and trial error. Walker argues that his counsel was ineffective for failing to raise issues that were presented in his original federal habeas petition in this case. Walker also argues that the Georgia Court of Appeals erred in denying the issues Walker's counsel did raise.

On appeal, Walker's counsel raised the following issues that were also raised in Walker's original federal habeas petition:

1. Improper Indictment. Walker contends that the indictment was not properly returned under Georgia law, in that it was not submitted in open court.

2. Admission of Similar Transaction Evidence. Walker contends that evidence of similar transactions was admitted in violation of Georgia law and procedure.

Walker's counsel also argued that the trial court erred in denying a motion to sever and that the evidence was insufficient to support the verdict. Walker contends that his appellate counsel was ineffective for failing to raise the following additional issues on appeal:

3. *Bruton* Violations. Walker contends that the trial court failed to grant a mistrial after an unredacted transcript of a co-defendant's statement, containing inculpatory statements about Walker, was published to the jury.

4. Discovery violations. Walker contends that prosecutors failed to provide timely discovery as required by Georgia law and rules of procedure.

5. Proceedings Outside Defendant's Presence. Walker contends that he was not present for critical discussions that took place in the trial court's chambers during trial.

6. Ineffective Assistance of Trial Counsel. Walker contends that his trial counsel failed to investigate his case and call witnesses in his defense.

5

These claims are addressed below on their merits and in connection with the questions of prejudice resulting from appellate delay and ineffective assistance of appellate counsel.

## EVIDENCE AT TRIAL

Before proceeding with an analysis of the claims, a review of the evidence presented at trial is necessary. The following statement is based on the undersigned's independent review of the entire case file undertaken during preparation of the August 19, 2011, Recommendation. This review showed that the State presented overwhelming evidence that Walker was guilty of the crimes of robbery, hijacking a motor vehicle, kidnaping, and aggravated assault, during a six-day trial that began on February 2, 1998, and ended on February 9, 1998.

The evidence showed that on September 4, 1997, at a gas station in Perry, Georgia, Walker and two co-defendants robbed an elderly couple at gunpoint, took their car while the wife was still inside, robbed the woman of her jewelry and ATM card, and forced her to write a check for $500 in cash. The three then led local police officers on a high speed chase through Houston County and fled on foot before being apprehended.

On September 4, 1997, Edward and Celibia[2] Allen arrived at the Smith Food Store in Perry, Georgia, in their Cadillac Eldorado. Mr. Allen parked the car and went inside the store, while his wife remained in the car working a crossword puzzle. He left the keys in the ignition. As Mr. Allen came out of the store, he was approached by two men wearing yellow gloves and carrying handguns. The men ordered him to get in the car. Mr. Allen refused. The men then jumped in the car, the older of the two in the back seat behind Mrs. Allen and the younger man in the driver's seat. The younger man drove the Cadillac away as the older man in the back seat

---

[2] Throughout the record of this case, Mrs. Allen is frequently referred to as Cecilia Allen. At trial, however, she identified herself as Celibia Allen.

pointed his gun at Mrs. Allen and made threats. As the Cadillac sped away from the parking lot, witnesses on the scene observed another vehicle, described as a Ford Explorer or Mercury Mountaineer, following close behind.

As the Cadillac was driven onto Interstate 75, Mrs. Allen was robbed at gunpoint by the man in the back seat. Mrs. Allen described the man in the back seat as a tall, slim black man. The driver was "nice-looking" and younger, perhaps eighteen. Both were wearing yellow gloves. Mrs. Allen testified that the man in the back seat forced her to give him her jewelry, including a thick herringbone necklace and four unusual rings. He also took her ATM card and forced her to give him her personal identification number. He and the driver discussed finding a bank where they could make a withdrawal. When Mrs. Allen told them there was no bank nearby, the man forced her to write a check to cash in the amount of $500.

After the two men drove off with his car and Mrs. Allen, Mr. Allen ran into the store and called the police. Within minutes, Lt. Kenny Cameron of the Perry Police Department spotted the Cadillac exiting the Interstate at Exit 45 onto Highway 247.   Lt. Cameron initiated a pursuit and followed the car as it turned left onto Gunn Road at a high speed. Mrs. Allen testified that the man in the back seat suddenly exclaimed, "We've got to get out of here." From the back seat of the two-door Cadillac, the man climbed out of the window and sat on the door of the car. A video camera in Lt. Cameron's patrol car recorded the man sitting on the door as the car rounded a curve on Gunn Road. Cameron testified that the Cadillac was traveling at a speed of approximately eighty miles per hour at the time. When the Cadillac was briefly out of sight of Cameron's car, the man jumped out onto the pavement. Cameron continued chasing the Cadillac and did not observe the escape.

Several hundred yards after the man in the back seat bailed out, the driver brought the Cadillac to a stop, jumped out, and ran into a peach orchard. The car was still in gear and rolled into a ditch on the other side of the road. Mrs. Allen was shaken, but unhurt. The driver, later identified as Charles Brown, was apprehended after he was observed trying to break into a car at a mobile home dealership on the other side of the peach orchard. Inside the Cadillac, the officers found a single Duxbac sandal. In a curve of the road several hundred yards away, officers found a matching Duxbac sandal, a tan leather glove, and a BB pistol. The glove was torn in several places on the front and on the back of the hand, and the BB pistol was scraped and scuffed on the barrel and hammer ends.

Later that evening, between 8:00 and 9:00 p.m., witness Stacy Pilkington was pumping gas at a convenience store near Exit 45 of Interstate 75. As he was going inside to pay for his gas, Mr. Pilkington was approached by a black man who was covered from head to toe in blood, with severe scratches and scrapes all over his body. The man was wearing a pair of green pants, similar to army fatigues, but was barefoot and had no shirt. The pants were severely torn in the back so that there "wasn't much to them." Mr. Pilkington testified that the man was also wearing a thick herringbone necklace that appeared to be a woman's necklace. The man told Mr. Pilkington he had been hit by a car on Interstate 75 and asked for a ride to the hospital. Mr. Pilkington told the man he was seriously injured and needed an ambulance. As Mr. Pilkington went back into the store to call an ambulance, he asked the man to sit down or lie down and wait for the ambulance to arrive. Instead, the man limped across the street to another convenience store and stood beside a dumpster. After a few seconds, the man disappeared behind the store.

Moments after Mr. Pilkington called for an ambulance, a number of police officers arrived. Officer Jimmy Howard, with his bloodhound Hooch, located the suspect's trail beside the

8

dumpster and followed it towards the Interstate exit ramp. Near the exit ramp he found Walker lying in a thick, bushy area at the edge of a fence. Walker was taken to a hospital for treatment and remained there several days recovering from his injuries. The next morning, in the daylight, Detective Leon Roberts returned to the scene and conducted a search of the area with a metal detector. Near the place where Walker was found, Roberts located some jewelry buried a few inches in the ground. The jewelry included an 18 inch gold herringbone necklace, a gold ring with eight stones, a gold panda ring, and a white gold ring with blue diamonds. The jewelry was identified by Mrs. Allen as the jewelry that was stolen from her by the man in the back seat of the Cadillac.

As further evidence that Walker was the man in the back seat of the Cadillac, the State presented testimony of several similar transactions that occurred in the days just prior to the incident in Perry. Witnesses were called to testify regarding a string of car thefts in Worth County, Georgia; Detroit, Michigan; and Knoxville, Tennessee. Witness Bobby Jerle Sapp testified that a Buick was stolen on August 29, 1997, from a car lot in Worth County, Georgia. That Buick was found burned in a parking lot in Detroit several days later. Witness Jewell Kitts, a salesman at a Detroit car dealership, testified that a customer came into the dealership just before closing on or about September 2, 1997, and asked to test drive a Mercury Mountaineer. The customer never returned with the vehicle. Kitts was able to identify Walker as the thief because Walker left a copy of his driver's license with the dealer before the test drive. Witnesses Lashana Coan and Katie Williams, also from Detroit, testified that two men carjacked them and took their Ford Explorer on the same weekend. Witness Shane Porter, a salesman at a dealership in Knoxville, Tennessee, testified that two men came into his dealership on September 3 and asked to test drive a Nissan Pathfinder. The two men kidnaped Porter at gun point and forced him to give them a ring from his

9

finger before they took the car. The Nissan was later found at the home of Roderick Hope, in Worth County. Porter's ring was found on the finger of John Walker, when Walker was admitted to the hospital after being apprehended by police.

In addition to the evidence from the victims, witnesses, and law enforcement officers, the State presented the testimony of co-defendant Charles Brown, Jr. Brown had previously pled guilty pursuant to a plea agreement and had been sentenced to ten years in prison. Brown testified that he was the driver of the Cadillac and that Walker was in the back seat. His testimony about the events inside the car was consistent with the testimony of Mrs. Allen, including his description of the robbery and of Walker climbing out of the window of the moving vehicle. Brown also described in detail the crime spree that began in Worth County, continued in Detroit and Knoxville, and finally ended in Perry. He confirmed that Walker was involved in each of the previous crimes. Brown was thoroughly cross-examined regarding a number of previous inconsistent statements he had given in which he denied involvement in the crime.

Walker was tried along with co-defendant Roderick Hope, who did not testify at trial. The State alleged that Hope was the driver of the Mercury Mountaineer that followed behind Brown and Walker when they took the Allens' Cadillac. Captain Frankie Peacock of the Byron Police Department testified that he spotted the Mountaineer while looking for the suspect, later identified as Brown, who had fled from the Cadillac into a peach orchard. While driving along a dirt road behind that orchard, Peacock was surprised by a vehicle he took to be a green Ford Explorer[3] coming out of the orchard at a high rate of speed. He attempted to follow the vehicle as it sped into a heavily wooded area, but he had to give up chase as the terrain became impassible. The suspect

---

[3]Numerous witnesses testified that the Ford Explorer and the Mercury Mountaineer were nearly identical vehicles.

vehicle continued despite the obstacles, striking trees and ditches and leaving debris throughout the woods. The vehicle was later located in a wooded area near Gunn Road and Dunbar Road. When Detective Roberts later processed and inventoried the vehicle, he found inside a Nissan key and a bottle of medication with a label indicating that it was prescribed for Tyshoanni Walker, who was identified as Walker's daughter and Hope's niece.

Although Hope did not testify, the State presented evidence of a videotaped interview that Hope provided to officers investigating the case on September 6, 1997. In his interview, Hope made a number of statements that inculpated Walker. After considerable argument by the parties, including a motion to sever by Hope[4], the trial court ordered the State to produce a redacted tape and transcript of the statement, eliminating any references to Walker. The State produced the redacted tape and transcript on Friday, February 6, 1998, and the statement was introduced into evidence on Monday, February 9, the last day of trial, through the testimony of Detective Andrew Dodson. After Hope's counsel objected that the redacted transcript edited out certain exculpatory statements that did not involve Walker, the court ordered the State to interrupt the tape and read in those edited portions. The State was instructed to provide the jury with a copy of the redacted transcript of the interview while the tape was being played.

Shortly after the State began to play the tape of Hope's interview, Walker's counsel noticed that the redacted transcript failed to omit one statement that had been edited from the tape. Counsel immediately asked the trial court to stop the tape and approached the bench for a conference that took place off the record. Walker's counsel later explained the substance of that conference on the record:

---

[4]Hope's motion to sever was based in part on his contention that some of the statements in his interview that inculpated Walker were exculpatory as to Hope.

11

> Your Honor, during the course of the playing of the tape, we were provided with a redacted copy of the transcript only this morning.   We saw that in the copy when the jury actually had my client's name as being in the vehicle at the time they had left home on the way to Perry, just the day of the incident.   At that point, we object, the tape was stopped, and we asked the Court at that time to grant a mistrial in regards to that.   Clearly it's a Bruton violation.   It's a violation of the Court's direction on the parameters of redaction.   The State did the redactions and of course he was aware of the parameters.   I imagine it was an oversight, but nonetheless, the bell has been rung.   The jury as they were reading along, the tape, of course, had that in there.   It says John came up here.

(Tr. 1379, Doc. 70-11, p. 39). Although a copy of the transcript does not appear to be in the record before this Court, the trial judge read the offending portion of the transcript into the record of the case after Walker's counsel had placed his objections on the record:

> Well, let me just, so we'll know exactly what we're talking about, let me just read into the record the objectionable portion, and I will state that it was deleted from the tape, but the copy of the transcript that the jurors were looking at and reading from, – on Page 5, at the top of the page, the question is, asked by Detective Dodson, okay, tell me what happened.   The answer is, stopped at a store and got something to eat and stopped at a store.   He let me drove with John, John Walker.   And that is the part that was not on the tape, but it was in the transcript that was – all of the jurors were looking at.

(Tr. 1379-80, Doc. 70-11, pp. 39-40). After some argument from the parties, the trial judge called a recess to take the motion for mistrial under advisement:

> I'll tell you what.   I know we're, you know, on sort of a tight schedule, but I want to just – I want to take a break and make some inquiries because, I mean, we've been at this for a week now, and of course, that – you know, if what has happened dictates a mistrial, it dictates a mistrial.   It doesn't matter how long you've been at

12

it. But if, on the other hand, if there's some way to be able to continue, then I'm going to look into that, also. Let me just take a few minutes and I'll be back and give you some . . .

(Tr. 1384, Doc. 70-11, p. 44).

When the judge returned from his recess, he was notified by counsel for co-defendant Hope that the State had renewed a previous plea offer and that Hope had opted to accept the offer and plead guilty. As part of the plea agreement, Hope agreed to testify if he was called as a witness by either party. The court took Hope's plea and then denied Walker's motion for mistrial, finding that the *Bruton* problem was alleviated by the opportunity to call Hope as a witness and cross-examine him. The State indicated that it would not call Hope as a witness on direct examination, but that it was willing to call Mr. Hope so that Walker's counsel could cross-examine him. Walker did not opt to call Hope for cross-examination, but renewed his motion for mistrial. The remainder of the tape was not played, and the evidence was closed. The court again denied Walker's motion for mistrial, although it did grant a directed verdict as to Count Five of the indictment, alleging theft by receiving stolen property.

When the jury returned, the court instructed the jurors that Hope was no longer involved in the case and that the jury was to consider only matters related to Walker. The court further instructed the jury to disregard anything that it saw or read with regard to Hope's interview. As the court explained to the jury:

> [Y]ou will notice that Mrs. Everett and Mr. Hope are no longer in the courtroom. And that I will tell you that as far as they're concerned, they're no longer involved in the proceedings in this case. That will not change your deliberations and considerations in the case, except that you will only be considering matters as against the defendant, Mr. John Orlando Walker.

13

And I will further tell you that the State has indicated that they're now resting their
case.   We are not going to proceed or play any further any of the video that we
started with.   I would ask you to simply disregard anything that you saw or heard
or read with regard to the video.   I understand that to some extent that's difficult to
do, but it simply will not be a part of the trial any longer, and you should not
consider in your deliberations any of the – anything that was said with regard to that
video that we'd started earlier this morning.

(Tr. 1405, Doc. 70-11, p. 65). After closing arguments and the court's charge, the jury adjourned to

deliberate and returned with a verdict finding Walker guilty of all remaining counts.

## PETITIONER'S GROUNDS FOR RELIEF

In accordance with the provisions of the Anti-Terrorism and Effective Death Penalty Act

(AEDPA), federal courts are prohibited from granting habeas relief with respect to any claim

adjudicated on the merits in state court unless that decision either: (1) resulted in a decision

contrary to, or involved an unreasonable application of, clearly established federal law as

determined by the Supreme Court, or (2) resulted in a decision based on an unreasonable

determination of the facts in light of the evidence presented in the state court proceedings. 28

U.S.C. § 2254(d); *Wellons v. Warden, Ga. Diagnostic and Classification Prison*, 695 F.3d 1202,

1206 (11th Cir. 2012). Not only is this standard "difficult to meet," *Harrington v. Richter*, 562

U.S. 86, 102 (2011), but it also is a "highly deferential standard for evaluating state-court rulings .

. . which demands that state-court decisions be given the benefit of the doubt." *Woodford v.

Visciotti*, 537 U.S. 19, 24 (2002).

A state court's decision is "contrary to" clearly established federal law if either "(1) the

state court applied a rule that contradicts the governing law set forth by Supreme Court case law, or

(2) when faced with materially indistinguishable facts, the state court arrived at a result different

14

from that reached in a Supreme Court case." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001). An "unreasonable application" of clearly established federal law may occur if the state court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case." *Id*. "An unreasonable application may also occur if a state court unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Id*.

When a "state court's application of federal law is challenged, it must be shown to be not only erroneous, but objectively unreasonable." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). Similarly, when reviewing a state court's decision applying federal law, a federal court must not determine the accuracy of the result, but instead, whether the result was objectively unreasonable, which is "a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). A state court's factual determinations are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## 1.    Appellate Delay

More than thirteen years passed between Walker's conviction in the Superior Court of Houston County and the resolution of his appeal in the Court of Appeals of Georgia. The majority of this delay was the result of the more than ten years required to hear Walker's motion for new trial, after which the Court of Appeals was able to hear Walker's appeal within two years. Several circuit courts have recognized that appellate delay "may . . . give rise to an independent due process claim." *Harris v. Chapman*, 15 F.3d 1538, 1557 (10th Cir. 1994).[5] There is no controlling

---

[5]See also, *Simmons v. Beyer*, 44 F.3d 1160 (3d Cir. 1995); *Coe v. Thurman*, 922 F.2d 528 (9th Cir. 1991); *Simmons v. Reynolds*, 898 F.2d 865 (2d Cir. 1990); *Turner v. Bagley*, 401 F.3d 718 (6th Cir. 2005).

Supreme Court precedent on the issue, however. Moreover, the state habeas court reasonably found that Walker failed to show the required prejudice to obtain habeas relief.

The State habeas court considered Walker's claim of appellate delay based on Georgia law. The Georgia Supreme Court recognized that substantial delays in the criminal appellate process implicate due process rights and may be remedied in habeas corpus. *Chatman v. Mancill*, 280 Ga. 253 (2006).

The United States Supreme Court, however, has yet to hold that appellate delay creates an independent due process claim. The Ninth Circuit has recently found that the enactment of the AEDPA eliminated the claim for appellate delay, because there is no "clearly established Federal law, as determined by the Supreme Court of the United States." *Hayes v. Ayers*, 632 F.3d 500, 523 (9th Cir. 2011) (citing 28 U.S.C. § 2254(d)(1)). The Eleventh Circuit has also recently observed:

> The United States Supreme Court has never held that there is a constitutional right to a speedy direct appeal in a state criminal case. Nor are we able to find any precedent suggesting that a constitutional violation arises from an untimely ruling on a motion for new trial.

*Owens v. McLaughlin*, 733 F.3d 320, 329 (11th Cir. 2013) (finding that delay of 25 years in ruling on motion for new trial did not violate constitutional rights).[6]  In the absence of any controlling law from the United States Supreme Court, Walker cannot show that the decision of the state habeas court was contrary to clearly established federal law. For that reason alone, Walker's claim based on appellate delay must be denied.

---

[6] *Harris v. Chapman*, *Simmons v. Beyer*, *Coe v. Thurman*, and *Simmons v. Reynolds* were decided prior to the enactment of AEDPA, with its requirement that a petitioner show that the state court's ruling was contrary to clearly established federal law as established by the United States Supreme Court. *Turner v. Bagley*, 401 F.3d 718 (6th Cir. 2005), was decided after the enactment of AEDPA, but the petitioner in that case was never allowed a state habeas proceeding. The dissenting judge in that case noted that a due process right to "speedy appeal" has not been recognized by the Supreme Court.

Applying the state law outlined in *Chatman v. Mancill*, the state habeas court determined that Walker failed to show that he was prejudiced as a result of the delay in his appeal. Like the Tenth Circuit in *Harris*, the Georgia court adapted the analytical framework used in cases of delay in the trial process, as prescribed in *Barker v. Wingo*, 407 U.S. 514 (1972). *Chatman*, 280 Ga. at 256. Modifying the four factors from *Barker* to fit the appellate context, the Georgia court in *Chatman* outlined the following factors for courts to consider in "determining whether delay in adjudicating a petitioner's direct criminal appeal violated the petitioner's due process rights:"

a. the length of the delay;

b. the reason for the delay and whether that reason is justified;

c. whether the petitioner asserted his right to a timely appeal; and

d. whether the delay prejudiced the petitioner by:

   i. causing the petitioner to suffer oppressive incarceration pending appeal; or

   ii. causing the petitioner to suffer constitutionally cognizable anxiety and concern awaiting the outcome of his or her appeal; or

   iii. impairing the petitioner's grounds for appeal or his or her defenses in the event of a reversal and retrial.

*Chatman*, 280 Ga. 256-59; compare *Harris*, 15 F.3d at 1559.

The first three factors are easily established in this case. The length of the delay, thirteen years, was extreme.[7] The reason for the delay is partially, if not entirely, explained by the succession of attorneys who were appointed to represent Walker. The record suggests that Walker had grievances with all of his attorneys, and it appears that two of his attorneys, Mr. Peterson and Ms. Lane, were incapacitated by severe health concerns for substantial periods of time.

---

[7]The court in *Harris* created a presumption that a delay of two years was inordinate. 15 F.3d at 1560.

The record also shows that Walker asserted his right to a timely appeal and made numerous efforts to speed up the process, including the filing of a habeas corpus petition in the state courts, the pursuit of a writ of mandamus in the state courts, the filing of a premature federal habeas action, and the filing of the present action.

With regard to prejudice, the *Harris* decision outlines three factors for consideration. Each of the three factors requires an inquiry into the merits of the petitioner's potential appeal. The first factor asks whether the petitioner was subject to oppressive incarceration, but incarceration can be considered "oppressive" only to the extent that the incarceration is wrongful, that is, to the extent that Walker is not guilty of the offense or is entitled to a new trial. The second factor asks whether the delay has caused the petitioner to suffer anxiety but such anxiety is significant only where there are reasonable grounds for appeal. "A petitioner has no reason to be anxious or concerned about the time it takes to adjudicate an appeal that is without merit." *Id*. at 1565. To show that a delay has impaired his grounds for appeal or his defenses in the event of retrial, a petitioner must show that he has "a colorable state or federal claim that would warrant reversal of his . . . conviction." *Id*. at 1564. The impact of delay on a petitioner's ability to mount a defense is irrelevant "if a petitioner has no credible grounds for reversal." *Id*.

The decision of the Georgia Court of Appeals indicates that Walker's state law claims did not warrant reversal of his conviction, and thus that he was not prejudiced by the delay. This Court's own analysis of Walker's claims on appeal confirms that he did not have a meritorious basis for appeal. Walker's grounds for appeal are discussed below in connection with his claims of ineffective assistance of appellate counsel. Because Walker lacked viable grounds for appeal of his conviction, and because the lapse of time prior to the completion of his appeal did not significantly diminish his ability to raise those claims on appeal, he is unable to show that he was ultimately

prejudiced by the delay in hearing his appeal, and is not entitled to any relief under 28 U.S.C. § 2254.

**2.**      **Ineffective Assistance of Appellate Counsel**

In addition to and in connection with his claim of appellate delay, Walker contends that his appellate counsel was constitutionally ineffective. As noted by Walker, the Sixth Amendment of the United States Constitution states that "in all criminal prosecutions, the accused shall enjoy ... the Assistance of Counsel for his defense." U.S. Const. Amend. VI. The right to counsel provision provides the accused the right to effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771, n.14 (1970). To prevail on a claim of ineffective assistance of counsel, the petitioner bears the burden of establishing by a preponderance of the evidence that: 1) his attorney's performance was deficient, and 2) he was prejudiced by the inadequate performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The standard in *Strickland* applies to allegations of ineffective assistance of appellate counsel as well as trial counsel. See *Eagle v. Linahan*, 279 F.3d 926, 938 (11th Cir. 2001). A petitioner must prove both prongs of the *Strickland* test to show his counsel was ineffective. *Id*. And as the Eleventh Circuit has noted: "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (*en banc*) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)).

To establish deficient performance, a petitioner must prove that his counsel's performance was unreasonable under prevailing professional norms and that the challenged action was not sound strategy. *Chateloin v. Singletary*, 89 F.3d 749, 752 (11th Cir. 1996). A strong presumption exists that counsel's performance was reasonable and the challenged action constituted sound trial strategy. *Id*. In order to establish that counsel's performance was unreasonable, a petitioner must

19

show that no objectively competent counsel would take the action in question. *Van Poyck v. Florida Department of Corrections*, 290 F.3d 1318, 1322 (11th Cir. 2002). A court analyzing *Strickland*'s first prong must be "highly deferential" and must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *Atkins v. Singletary*, 965 F.2d 952, 958 (11th Cir.1992) ("We also should always presume strongly that counsel's performance was reasonable and adequate ....") (citation omitted).

To establish prejudice, a petitioner must show that there is a reasonable probability that, but for counsel's inadequate representation, the outcome of the proceedings would have been different. *Strickland*, 466 U.S. at 697; *Meeks v. Moore*, 216 F.3d 951, 960 (11th Cir. 2000). Reasonable probability is defined as a "probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694). If a petitioner fails to prove that she has suffered prejudice, the court need not address the deficient performance prong of the *Strickland* test. *Holiday v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000).

The Supreme Court also considered the special nature of appellate advocacy, observing that "experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751–52 (1985). "Most cases present only one, two, or three significant questions. . . . Usually, . . . if you cannot win on a few major points, the others are not likely to help, and to attempt to deal with a great many in the limited number of pages allowed for briefs will mean that none may receive adequate attention." *Id.* at 752. An appellate attorney "is not required under the Constitution or the *Strickland* standards to raise every non-frivolous issue on appeal." *Brown v. United States*, 720 F.3d 1316, 1335 (11th Cir. 2013) (citing *Jones*, 463 U.S. 745, 754 (1983) ("Nothing in the Constitution or our interpretation

20

of that document" requires an appellate attorney "to raise every 'colorable' claim suggested by a client.")).

The state habeas court conducted an evidentiary hearing on August 20, 2012. Walker's final appellate counsel, David Daniell testified. Daniell testified that he was appointed to represent Walker on appeal in December 2010, to substitute for Walker's previous appointed attorney, Elizabeth Lane. The record does not show when Lane was appointed, but it is apparent that she was appointed some time before April 4, 2009, in connection with Walker's third hearing on motion for new trial. (See Doc. 89). Lane filed a notice of appeal on August 20, 2010. Daniell filed his appellate brief on January 29, 2011.

Daniell testified that he received the entire case file from Lane, including transcripts of the trial and motion for new trial hearings, and that he read all of them. Daniell also spoke with Walker's appointed counsel in this federal habeas action, John Francisco, and familiarized himself with the issues raised in Walker's federal case. He stated that he was aware of various issues that Walker had raised in his motion for new trial, including "*Bruton* issues" and "issues dealing with discovery," but decided to focus on other issues that he considered more meritorious:

> My job as an appellate attorney is to review all the available materials. And at that point, after research, make a determination for what I feel is the strongest legal issues to raise and argue on your behalf. And, of course, during the course of that you do not raise every single thing that's a cognizable legal argument. My theory, at least, and I think a lot of appellate attorney's theories are, that that weakens your stronger arguments by diluting them by raising other arguments that aren't as likely to prevail.

Doc. 127-7, p. 31. Daniell felt that Walker's strongest appellate arguments concerned the admission of similar transaction evidence and the court's denial of his motion to sever. *Id*. Daniell

also raised arguments about the validity of the indictment and about the sufficiency of the evidence.

      **a.**     ***Bruton* issues**

In his state habeas petition, Walker argued that his appellate counsel was ineffective for failing to raise a claim of error under *Bruton v. United States*, 391 U.S. 123, 126 (1968). Walker contends that his Sixth Amendment right to confront witnesses against him was violated when the jury was provided with a transcript of co-defendant Hope's statement that included an un-redacted statement incriminating Walker.

The state habeas court found that appellate counsel's decision not to raise a *Bruton* issue was reasonable under the standard of *Strickland*. This finding was consistent with clearly established federal law and based on a reasonable determination of the facts in light of the evidence presented in the state court proceedings.

In the state habeas court's evidentiary hearing, Daniell testified that he was aware of the *Bruton* concerns that Walker had raised in his federal habeas action, but he chose not to pursue them in favor of other arguments he considered more "credible." (Doc. 127-7, pp. 56-57). With regard to the *Bruton* concerns, Daniell chose to focus on the trial court's denial of Walker's motion to sever. *Id*. at 55. Daniell's decision to focus on the motion to sever rather than the *Bruton* issue was reasonable, and Walker cannot show that he was prejudiced by it.

Walker was not prejudiced by his counsel's decision not to raise the *Bruton* issue because the claim was not likely to succeed on appeal. In *Bruton*, the Supreme Court held that the confrontation clause of the Sixth Amendment forbids the admission of a non-testifying co-defendant's confession that inculpates the defendant. It is not clear from the record that the statement admitted in this case inculpated Walker in violation of *Bruton*. To the extent that the

admission of the statement did violate *Bruton*, however, it was cured by Hope's guilty plea, which made him available for confrontation and cross-examination. It was also harmless error, under both the standard of review on petition for writ of habeas corpus and under the standard of review on direct appeal, because the statement was not a significant piece of evidence in comparison with other, overwhelming evidence of Walker's guilt.

Based on the information in the record, it is not apparent that the un-redacted statement in the transcript was directly inculpatory of Walker. Hope simply states that Walker was in a vehicle with him earlier on the date of the incident and that he and Walker stopped somewhere to get something to eat. *Bruton* has been held to exclude "only those statements by a non-testifying defendant which directly inculpate a co-defendant." *United States v. Beale*, 921 F.2d 1412, 1425 (11th Cir. 1991). "For *Bruton* to apply, a co-defendant's statement must be clearly inculpatory standing alone." *United States v. Satterfield*, 743 F.2d 827, 849 (11th Cir 1984), superseded by statute on other grounds as stated in *United States v. Edwards*, 728 F.3d 1286 (11th Cir. 2013). *Bruton* is not violated where a statement is "not incriminating on its face" but becomes so only "when linked with evidence introduced later at trial." *Richardson v. Marsh*, 481 U.S. 200, 208 (1987).

The un-redacted statement is not incriminating on its face. It does not say that Walker committed any crime or that Walker was present at the time of the carjacking in Perry. When read in the context of Hope's entire statement, however, it does support the inference that Walker remained with Hope and was with Hope at the time of the crime. Although this inference itself is not directly incriminatory, for the sake of caution the Court assumes that the statement was sufficiently inculpatory to implicate *Bruton* and the Confrontation Clause.

To the extent that the un-redacted statement was inculpatory, any *Bruton* error was cured when Hope entered his guilty plea and became available for cross examination by Walker. Inculpatory statements by a non-testifying co-defendant are prohibited under *Bruton* because the Fifth Amendment makes it impossible to call the co-defendant for cross examination. In this case, Walker had the opportunity to confront Hope and cross-examine him about the statement because Hope pled guilty and made himself available as a witness. The jury did not hear the remainder of Hope's confession, and the trial court instructed the jury to disregard the entire thing. For tactical reasons, Walker's counsel opted not to call Hope for cross-examination.[8]

Finally, even if the admission of the statement had been improper under *Bruton* and was not cured by Hope's subsequent guilty plea, its admission was harmless error. On collateral review under 28 U.S.C. § 2254, a *Bruton* error is harmless unless the error "had substantial and injurious effect or influence in determining the jury's verdict." *Grossman v. McDonough*, 466 F.3d 1325, 1339 (11th Cir. 2006) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).[9] In light of the overwhelming evidence of Walker's guilt from other sources and the minor importance of the

---

[8]At the time of trial, Georgia's criminal trial procedures allowed a defendant to have the final closing argument if the defendant did not present any evidence. Calling Hope for cross examination would have given the State the last word on closing.

[9]The harmless error standard for direct appeal is more stringent, requiring a finding that "the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." *Collum v. State*, 281 Ga. 719, 721-22 (2007) (quoting *Schneble v. Florida*, 405 U.S. 427, 430 (1972)). In considering whether a violation of the Confrontation Clause is harmless, Georgia courts consider a number of factors, including: the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. *Collum*, 281 Ga. at 722 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). The court in *Grossman* observed that the less-stringent standard in habeas cases is warranted because the habeas remedy is "designed to afford relief only to those whom society has 'grievously wronged.'" *Grossman*, 466 F.3d at 1339 (quoting *Brecht*, 507 U.S. at 637). Because the evidence against Walker in this case was so overwhelming, the admission of the statement at issue was harmless under either standard.

statement admitted in the transcript of Hope's confession, the record in this case indicates that the statement did not have a substantial and injurious effect on the jury's verdict.

The unredacted mention of Walker in the transcript of Hope's confession was relatively insignificant as evidence of Walker's guilt. It indicated only that Walker had been with Hope in a vehicle at some time earlier in the day. In contrast, there were volumes of evidence from other sources to prove that Walker was the man who sat in the back seat of the Allen's Cadillac when it was stolen, who pointed a gun at Mrs. Allen and demanded that she take off her jewelry and write a check for $500, and who jumped from the speeding vehicle during the police pursuit. This evidence included similar transaction testimony from numerous witnesses, showing that Walker was with Hope and Brown during a crime spree that included several car thefts and carjackings over two or three days prior to the incident in Perry. The evidence also included the fully confronted and cross-examined testimony of co-defendant Brown, who described the chain of events in detail and testified that Walker sat in the back seat and robbed Mrs. Allen and then climbed out the window of the speeding car. Brown's testimony was consistent with the testimony of Mrs. Allen, who also stated that the man who robbed her climbed onto the window of the car and jumped out while the police were pursuing. Lt. Cameron, pursuing the vehicle, observed the man climbing out of the window. The evidence showed that Walker was found hiding in a ditch not far from the place where the suspect was seen climbing out of the vehicle, with the severe injuries that would follow from jumping out of a speeding vehicle. Mrs. Allen's jewelry was found buried nearby. Walker was wearing a ring stolen from a previous carjacking victim. All of this evidence was far more than enough to prove beyond a reasonable doubt that Walker was guilty of the crimes for which he was convicted. In light of this overwhelming weight of evidence, the

inadvertent admission of a single brief statement in a transcript, stating that Walker was in a vehicle with a co-defendant earlier in the day, was harmless.

      **b.**      **Discovery Violations**

      Walker contends that he is entitled to relief because the State did not comply with Georgia's discovery procedure. His appellate counsel chose not to pursue the discovery issues because he did not believe they were "viable" on appeal. (Doc. 127-7, p. 68). Based on the record, counsel's decision was reasonable and these claims were not likely to succeed on appeal.

      A substantial record was developed at trial concerning Walker's claims of discovery abuse. At the beginning of the trial, prior to jury selection, counsel for Walker's co-defendant, Hope, raised objections to the State's production of discovery. Walker's counsel joined in Hope's objections and motion for sanctions. The trial court conducted a lengthy inquiry into the discovery process. Hope's counsel indicated that she had spoken with the prosecutor on the Monday before trial and arranged to go to the District Attorney's office to review the file. Hope's counsel went to the District Attorney's office on Thursday and met with the prosecutor's secretary to review the file:

> I went over there, I believe it was on Thursday, and she gave me what she said was their entire file, except for some tape transcripts which she said were going to be coming shortly thereafter.  She called me back on Friday morning and indicated that they did have the transcripts in, and that I could come and look at those. Saturday night just inadvertently I ran into one of the police officers up at Walmart and he indicated things about pictures.  I said I didn't know anything about any pictures, nobody has shown me any pictures.

(Tr. 9-10, Doc. 70-2, pp. 10-11). Hope's counsel moved to quash the pictures and Walker's counsel joined in the motion. Walker's counsel noted that he had allowed Hope's counsel to take

26

the lead in obtaining discovery and had access to the discovery through her. (Tr. 26-27, Doc. 70-2, pp. 27-28).

In response to the defendants' objections, the prosecutor explained that he had an "open file" policy, and had made his file available for inspection beginning on January 9, 1998, nearly a month before trial. (Tr. 22, Doc. 70-2, p. 22). Nevertheless, he contended, defendants' counsel had not sought to review the file until the week before trial. The prosecutor stated that the pictures in dispute were not in the file at the time Hope's counsel came to his office because they had been sent to a photo processor to be enlarged. (Tr. 24, Doc. 70-2, p. 25). He described the pictures as "crime scene pictures, some pictures of recovered evidence and where it was recovered, . . . area pictures, . . . [and] some pictures of [Walker] from the hospital." (Tr. 16, Doc. 70-2, p. 16). He offered to make the pictures available at his office and also offered to allow counsel to view the enlargements, which were in the trunk of his car outside the courthouse. (Tr. 41, Doc. 70-2, p. 42).

The trial court did not rule on the defendants' motion to quash immediately, but reserved ruling until after jury selection. The following morning, after jury selection was completed, the court heard further argument with regard to discovery issues. During that conference, Walker's counsel raised the additional objection that he had been provided the previous afternoon with a stack of transcripts of recorded statements from Hope and Brown. (Tr. 215, Doc. 70-3, p. 103). The prosecutor responded that those transcripts had not previously been available to the State because they had not been completed by the court reporter, but explained that the tapes themselves had previously been made available to the defendants. (Tr. 216, Doc. 70-3, p. 104). Defendants did not make a formal motion with regard to the transcripts. The trial court indicated that his response to any problems arising from the transcripts would likely involve giving the defendants additional time to review them:

27

> If we get to a point where any of the stuff is about to be used and you feel like you
> need some time to look over it let me know and I'll consider perhaps taking a break
> or something to give you some additional time.

(Tr. 217, Doc. 70-3, p. 104). It does not appear from the record that the trial judge ever made an express ruling on the motion to quash the pictures, but he did suggest that he might allow counsel additional time to review the pictures, upon request. (Tr. 212, Doc. 70-3, p. 99). The pictures were ultimately admitted into evidence.

During the same conference, Hope's counsel indicated to the court that she had just received a videotape from the State that was not previously provided. She explained that the videotape depicted the scene where the Mercury Mountaineer was found. (Tr. 205, Doc. 70-3, p. 92). The prosecutor stated that the video had been produced by a detective in January. (Tr. 206, Doc. 70-3, p. 93). The court expressed some reservations about the tape:

> I'm not sure whether I would allow a tape that was made by them sometime in
> January that's not made available until today.   I'm not – I mean, it doesn't sound to
> me like it's critical one way or the other anyway, but I may not allow that to come
> in.

(Tr. 209, Doc. 70-3, p. 96). Again, the court made no express ruling on the videotape, and it is unclear from the record whether it was ever admitted at trial or not.

Walker's appellate counsel reasonably concluded that these discovery issues were not likely to warrant reversal on appeal. Criminal discovery procedures in Georgia are governed by O.C.G.A. § 17-16-1, *et seq*. The issues raised by Walker in this case are governed specifically by O.C.G.A. § 17-16-4, which requires the State to disclose evidence and make it available for inspection and copying no later than ten days prior to trial. Trial courts in Georgia have "broad

discretion in fashioning remedies for violations of O.C.G.A. § 17-16-4." *Brown v. State*, 281 Ga. App. 557, 559 (Ga. Ct. App. 2006).   Possible remedies for discovery violations are outlined in O.C.G.A. § 17-16-6, which provides that

> the court may order the state to permit the discovery or inspection, interview of the witness, grant a continuance, or, upon a showing of prejudice and bad faith, prohibit the state from introducing the evidence not disclosed or presenting the witness not disclosed, or may enter such other order as it deems just under the circumstances.

The exclusion of evidence, however, "is a harsh sanction and should be imposed only when there is a showing of prejudice to the defense and bad faith by the State." *Fairbanks v. State*, 242 Ga. App. 830, 832 (Ga. Ct. App. 2000).

In this case, the trial court acted appropriately within its broad discretion in dealing with the objections raised by the defendants. The court essentially ordered that the State promptly produce any remaining evidence to defendants, and indicated that it would consider granting defendants a recess to review the evidence if necessary. Exclusion of the evidence was certainly not warranted. The record does not support a finding of bad faith on the State's part. The prosecuting attorney represented that he had made the State's file available for inspection as early as January 9, 1998. He explained the photographs in question were not in the file at the time defense counsel came to inspect because they had been sent out for enlargement. The transcripts of the statements were not produced because they had not been completed yet. There is no explanation in the record for the delay in producing the video of the scene where the Mountaineer was found, but there is nothing to indicate that this delay was the result of bad faith.

The record further shows that the delayed production of the photographs, transcripts, and videotape did not prejudice the defendants. The photographs and videotape were not complicated or controversial pieces of evidence and were not particularly inculpatory or exculpatory in nature. They were simply depictions of objects or scenes to be submitted for illustrative purposes. The transcripts were written versions of recorded statements that had previously been produced and reviewed by defendants. None of the evidence at issue introduced new substantive issues or would have required the defendants to adjust their trial strategy or significantly amend their cross-examinations of witnesses. As such, more severe sanctions such as exclusion of the evidence or continuance of the trial were not warranted.

The trial court's admission of the evidence was consistent with Georgia law and was not a violation of any federal law or constitutional provision. On petition for writ of habeas corpus under 28 U.S.C. § 2254, a federal court's review of a state court's ruling on state law issues is limited to determining whether the court's decisions "so infused the trial with unfairness as to deny due process of law." *Felker v. Turpin*, 83 F.3d 1303, 1311 (11th Cir. 1996). Such unfairness does not appear in this case, where the State complied with state law requirements for discovery and any delay in production of evidence was not prejudicial to the defendants. As Walker's appellate counsel reasonably concluded, raising these non-meritorious issues on appeal would simply have "diluted" or distracted from more meritorious arguments. The state habeas court correctly concluded that counsel did not provide ineffective assistance in choosing not to raise them on appeal.

c.        **Proceedings Outside the Defendants' Presence**

Walker claims that his rights were violated when the trial court conducted certain proceedings outside of his presence. Specifically, he contends that the court had *in camera* conferences with the attorneys concerning the redaction of Hope's statement, proposed jury charges, payment for copies of redacted transcripts, and the motion for mistrial following the introduction of the unredacted portion of Hope's statement.  He argues that the last of these conferences was the most significant, in that it resulted in Hope's decision to enter a guilty plea. Walker's counsel did not raise this claim on appeal. Because this claim was without merit, Walker cannot show that counsel's decision was unreasonable or that he was prejudiced thereby.

A defendant's right to be present during trial proceedings arises from the confrontation clause of the Sixth Amendment and the due process clause of the Fourteenth Amendment.   It is not an absolute right to be present for every moment of trial, however. The Supreme Court explained the nature and limitations of the right to be present in *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987):

> The Court has assumed that, even in situations where the defendant is not actually confronting witnesses or evidence against him, he has a due process right to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge. Although the Court has emphasized that this privilege of presence is not guaranteed when presence would be useless, or the benefit but a shadow, due process clearly requires that a defendant be allowed to be present to the extent that a fair and just hearing would be thwarted by his absence. Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure.

*Id.* (internal quotations and citations omitted). To establish his claim, therefore, Walker must show that the conduct of proceedings outside his presence somehow thwarted his opportunity to receive a fair and just hearing or to forward his defense.

The record indicates that any in-chambers conferences between the attorneys and the trial judge were brief, were related to legal matters, and were followed by detailed discussions on the record.   For example, with regard to the redaction of the Hope transcript, Hope's counsel states, "We talked about this a little bit in Chambers off the record." (Tr. 1354, Doc. 70-11, p. 14). Following counsel's remark, the court entered into a lengthy discussion of the redaction process in open court and on the record.   (Tr. 1354-65, Doc. 70-11, pp. 14-25).

Shortly after that discussion, Hope's counsel indicated that the parties had conducted "an informal charge conference" in chambers, apparently on Friday afternoon, February 6. (Tr. 1381, Doc. 70-11, P. 41). As there is no other record of a charge conference in the transcript, it appears that the entire discussion of the jury charge was conducted in chambers. Although the charge conference is an important aspect of a trial, such a conference concerns primarily legal issues. There is nothing in this case to indicate that Walker's presence at the charge conference would have had an impact on the charge or on the outcome of the trial. Walker has not contended that the charge given by the court was erroneous or that he was prejudiced by any charge given or not given.

The *in camera* discussion of who would pay for copies of transcripts of the Hope statement was inconsequential. The matter was discussed on the record after the conference in chambers. The prosecuting attorney indicated that the court had agreed to pay for the copies provided to defendants, both of whom were indigent. (Tr. 216, Doc. 70-3, p. 103).

Walker argues that "the most critical" discussion conducted in chambers concerned the motion for mistrial and guilty plea negotiations after the improperly redacted Hope transcript was introduced. The record shows, however, that any discussions in chambers were brief, and the motion and plea agreement were thoroughly discussed in court and on the record. After Walker's motion for mistrial, the court took a recess to take the matter under advisement. During the recess, the prosecuting attorneys made plea offers to both defendants. Comments by the court suggest that the court had been informed, prior to returning to the courtroom, of the nature of Hope's plea agreement and of the State's plea negotiations with Walker. (Tr. 1389, Doc. 70-11, p. 49). The record suggests that any communications with the court during the process were purely informative. It is clear that Walker participated in the critical aspects of the plea negotiations. His attorney explained the State's plea offer on the record, and his client's reasons for rejecting that offer. (Tr. 1391, Doc. 70-11, p. 51).

The record of the trial proceedings is consistent with the recollection of Walker's trial counsel at this Court's hearing on April 8, 2009. At that hearing, counsel testified that the trial judge ordinarily did not conduct proceedings *in camera*, and that such proceedings were generally for information purposes and followed by discussions on the record:

> I can't tell you a specific hearing that may have been held, and the practice was not to hold a hearing in chambers without your client. That was not the judge's practice at the end of the day. It was not uncommon to be in chambers even scheduling - - even talking to the secretary or whatever, the Judge comes in and the Judge saying, well, tell me what we're going to do? And we might say, well, Judge, we're mad because we got this indictment on Saturday afternoon, you know, whenever, and he'd say, well, I don't know, let me think about it or if we need to put it on the record. And then you would go out and put something on the record. So it was not a - - you were not doing anything that was set up as a hearing, or

anything, addressing some right or asking for a ruling that would hurt your client or might affect your client's rights as he proceeded in the case.   It just - - it would be - - it was almost a collegial type informal - - this is what we're fixing to raise outside when we go outside, Judge, just want to give you notice.   We may need 30 minutes before the jury comes in, you know, that type of thing.   It was not a - - you know, I mentioned before at the last hearing, I guess - - it was a long hall, and sometimes during that long walk down the hall that's where those things might get said.   So I don't recall there being a hearing about anything affecting Mr. Walker's case without Mr. Walker being there.   I particularly would not do that, and you have a court reporter, so that's all I can say about that.

Hearing Tr. 193-94 (Doc. 97). Consistent with counsel's recollection, the trial record does not show that Walker's confrontation and due process rights were significantly affected by any proceedings conducted outside his presence. Accordingly, his appellate counsel was not ineffective in choosing not to raise such claims on appeal, and Walker was not prejudiced by this decision.

       **d.**      **Ineffective Assistance of Counsel**

Finally, Walker contends that his trial counsel failed to provide him with effective assistance, in violation of his Sixth Amendment rights. The state habeas court found that these claims were procedurally defaulted because they were not raised on appeal and found that Walker had not shown ineffective assistance of appellate counsel to overcome the default.

Review of the transcripts of Walker's trial and of the evidentiary hearing at which both Walker and his trial counsel testified demonstrates that the assistance provided by trial counsel was reasonable considering all the circumstances of his case. As such, the state habeas court correctly found that Walker cannot show that he received ineffective assistance of trial counsel or that he was prejudiced by his counsel's representation.

The Sixth Amendment's right to effective assistance of counsel serves to ensure that the adversarial process is effective and that criminal defendants have an adequate opportunity to challenge the State's case. "The purpose is simply to ensure that criminal defendants receive a fair trial." *Strickland*, 466 U.S. at 689. The Sixth Amendment does not guarantee perfection in representation. As such, "[j]udicial scrutiny of counsel's performance must be highly deferential," and courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

A petitioner for writ of habeas corpus has the burden of establishing that counsel was constitutionally ineffective. To demonstrate ineffectiveness, a petitioner must show that counsel's performance "fell below an objective standard of reasonableness" and was "outside the wide range of professionally competent assistance." *Johnson v. Secretary, DOC*, 643 F.3d 907, 928 (11th Cir. 2011) (quoting *Strickland*, 466 U.S. at 688, 690). Given the judicial deference to counsel's performance, the petitioner must overcome a strong presumption that counsel's performance fell within that range and must show that "no competent counsel would have taken the action that his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000).

Walker has failed to make such a showing in this case. The record shows that the efforts made by trial counsel were consistent with the standards of professional diligence and that his strategic and tactical decisions were reasonable in light of the circumstances. Counsel conducted an appropriate investigation of the case, meeting with his client on several occasions, obtaining and reviewing discovery from the State, and interviewing witnesses where possible. Counsel testified at this Court's habeas hearing that he spoke with most of the law enforcement witnesses but could not remember if the victims were willing to talk with him. (Hearing Tr. 206, Doc. 97). He did not interview the out-of-state witnesses listed by the State in connection with the similar

35

transaction evidence. *Id*. at 144.   He obtained discovery with the help of co-defendant's counsel, whose office was located "about a hundred feet" from the District Attorney's Office. *Id*. at 192. The trial transcripts indicate that counsel was familiar with the evidence prior to trial, and he was able to conduct effective cross-examinations and make vigorous arguments concerning the admissibility of evidence such as the similar transactions testimony and the portions of Hope's statement that inculpated Walker.

The strategy that counsel pursued was reasonable given the circumstances of the case. Counsel noted that Walker did not have an alibi defense and did not have any witnesses to corroborate his story that he was struck by a car while trying to cross the Interstate. As such, counsel opted to attack the credibility of the State's witnesses and focus on the lack of a positive identification of Walker by the victims or the witnesses on the scene. When asked at Walker's habeas hearing whether he had been able to formulate any viable defenses, counsel responded:

> I think that I argued some about whether or not the identity - - and I may have argued that in closing, you know - - whether or not she had time, was able to identify Mr. Walker. You know, I didn't have an alibi defense. Mr. Walker had told me at the time about the injuries and how he contended he received those.   And we were not able to lock down anything really corroborating that part of it.   And so it left us basically cold punching and trying to attack the credibility of the State's witnesses about what they may or may not have seen, or who they may or may not have seen. Whether the clothing matched, whether the - - so those types of defenses, yes. But, I mean, again, I couldn't say Mr. Walker was visiting family out of town, I didn't have that type of evidence.

*Id*. at 183-184. This strategy was within the range of reasonable strategies that competent counsel would undertake in a case of this nature.

In addition to challenging the credibility of the State's witnesses and attacking deficiencies in the evidence, counsel pursued a strategy of challenging the admission of much of the State's evidence through aggressive motions.  During the course of the trial, counsel attacked the timeliness and sufficiency of discovery provided by the State, raised procedural errors in both the original and the second indictment, contested the admission of the similar transaction evidence, opposed the introduction of Hope's statement in its entirety, and pushed to have the statement redacted if it was admitted.  Finally, counsel moved for mistrial when he observed that the transcript of Hope's statement included one sentence that should have been redacted pursuant to the court's order.   The transcripts of the trial and pretrial proceedings show that counsel engaged the trial court and the State in lengthy arguments over many of these matters, and generally reflect that counsel was well-prepared with knowledge of the evidence and of the relevant legal authorities.

Walker has objected that his counsel failed to investigate adequately, and in his testimony in this Court's habeas hearing Walker contended that counsel had failed to find six witnesses. He identified these witnesses as two paramedics who took him to the hospital, "two guys" that wrote to him in jail after his conviction, "Ms. Stacy Pendleton," and "a cowboy." (Hearing Tr. 218-20, Doc. 97). Walker admitted that "Ms. Pendleton" and the cowboy testified at trial. *Id*. at 221. It is not clear which witness was the cowboy, but the Court presumes that "Ms. Stacy Pendleton" was actually Mr. Stacy Pilkington, who testified at trial that Walker claimed to have been hit by a car when attempting to cross the Interstate. Walker contends that the two paramedics would also have testified that he told them about being hit by a car. To the extent that such testimony would have been admissible in Walker's case, it would have been merely cumulative of Pilkington's testimony about Walker's statements.

Walker contends that the "two guys" who wrote to him in jail would have testified that they actually saw him get hit by a car on the Interstate. He has provided no information whatsoever to identify these people, and the Court finds his testimony about their existence lacking in credibility. Even if Walker is to be believed, these two witnesses surfaced only after Walker was convicted, and there is nothing to indicate that Walker's trial counsel should have been aware of them or could have found them in the exercise of reasonable diligence.

The record as a whole thus shows that Walker's trial counsel performed within the range of professional competence and provided Walker with constitutionally adequate assistance.

Walker's original, *pro se* petition included a claim of ineffective assistance of appellate counsel, but this claim is not argued in the brief prepared by his attorney.   The record before the Court at this time is inadequate to permit a thorough evaluation of appellate counsel's performance, except with regard to the delay in the appeal.   Although it appears that much of that delay may have been attributable to Walker's various appellate attorneys, the Court has already noted that Walker was ultimately not prejudiced by this delay.

**3.**     **Issues Raised on Appeal**

In his state habeas proceeding, Walker argued that his appellate counsel provided ineffective assistance in failing to raise arguments related to the validity of the indictment and the admission of similar transaction evidence. The record shows that Walker's counsel did raise these arguments on appeal and that they were decided on the merits. The state habeas court found that because Walker appealed from the denial of his motion to quash the indictment on state law grounds only, any constitutional claims related to that issue were procedurally defaulted. The state habeas court found that the admission of the similar transaction evidence was a matter of state law and was not cognizable in habeas corpus. The state habeas court further found procedurally

defaulted any claims that the State failed to provide witness information and that the State and the trial court failed to follow Georgia's Uniform Superior Court Rule 31.3 in admitting the evidence. The state habeas court's decision was consistent with clearly established federal law and based on a reasonable reading of the record.

### a.      Improper Indictment

Walker contends that his rights were violated because the second or superseding indictment on which he was convicted was not properly returned in court as required under Georgia law. This claim was raised on appeal and the Court of Appeals of Georgia found that the indictment was returned in a manner consistent with Georgia law. The claim involves a matter of purely state law, and there has been no showing that the manner in which the indictment was returned violated Walker's due process rights under the United States Constitution. The record thus shows that Walker's trial on the superseding indictment was not reversible error under Georgia law and was consistent with due process under federal law.

Walker was tried under a second indictment that the State brought shortly before trial to correct errors in his original indictment. Walker was first indicted on September 16, 1997, shortly after the crime took place. In that first indictment, the grand jury charged Walker with armed robbery, hijacking a motor vehicle, kidnaping, aggravated assault, theft by receiving stolen property, and theft by taking. On January 30, 1998, the weekend before trial, the grand jury returned a second indictment against Walker. The only substantial difference between the first indictment and the second was the change of the offense charged in Count One from armed robbery to robbery. The robbery charge in the second indictment included the same elements as the armed robbery charge in the original indictment. All other differences between the two were in

39

minor details. On the first day of trial, the trial court agreed to enter an order dismissing the first indictment, and the second indictment was presented to the jury.

At trial and on appeal, Walker contended that the new indictment was not valid because it had not been returned to a judge in open court. The Georgia Court of Appeals found that the indictment was returned as required by Georgia law, by a bailiff in open court. *Walker*, 310 Ga. App. at 230.

The trial court did not violate Walker's federal due process rights by denying his motion to quash the second indictment and denying his motion to continue the trial. The fundamental purpose of an indictment, as a charging document, is to provide a defendant with notice of the elements of the offense with which he is charged and to apprise him "of what he must be prepared to meet." *Russell v. United States*, 369 U.S. 749, 764 (1962). Both indictments in this case state substantially the same elements of the offenses charged, with only minor technical differences. Thus, Walker had notice of the charges against him when he received the first indictment in September 1997, and he was not prejudiced by the return of a second indictment in January 1998. The discovery he received under the first indictment was equally applicable to the second indictment, and the trial court considered the motions filed under the first indictment to be adopted under the second indictment and incorporated into the new case number. Walker had adequate notice of the charges and a full opportunity to prepare to meet the charges against him, as required by the due process clause of the United States Constitution.

### b.      Admission of Similar Transaction Evidence

Walker contends that the trial court erred in admitting the similar transactions evidence without following the procedural requirements of Georgia law. Walker's counsel raised this claim on appeal.

40

A federal court reviewing a habeas petition does not second-guess a state court's evidentiary rulings under state law, but only determines whether such rulings violated Constitutional due process rights. *Felker v. Turpin*, 83 F.3d 1303, 1311-12 (11th Cir. 1996). "Only when evidentiary errors 'so infused the trial with unfairness as to deny due process of law' is habeas relief warranted."  *Id*. (quoting *Lisenba v. California*, 314 U.S. 219, 228 (1941)). In this case, the admission of the similar transaction evidence was consistent with federal guarantees of due process.

Georgia law requires notice and a hearing prior to the admission of similar transaction evidence. The State must give written notice of intent to introduce similar transactions evidence at least ten days prior to trial. Uniform Superior Court Rule 31.1. The notice must include the transaction, date, county, and name of the victims for each transaction. Uniform Superior Court Rule 31.3(B). The court must hold a hearing on the admissibility of the evidence, and "may receive evidence on any issue of fact necessary to determine the request, outside the presence of the jury." *Id*. Georgia courts have held that the trial court must then make a finding, on the record, "(1) that the evidence is being presented for an appropriate purpose; (2) that the accused actually committed the similar offense; and (3) that the similar offense and the charged offense are sufficiently connected or similar that proof of the former tends to prove the latter." *Tam v. State*, 225 Ga. App. 101, 102 (Ga. Ct. App. 1997) (citing *Williams v. State*, 261 Ga. 640 (Ga. 1991)).

The record in this case shows that the State provided the required notice and the court held the required hearing, but it is not clear that the court made the three *Williams* findings on the record. The State filed a notice of its intent to present evidence of similar transactions. On January 21, 1998, the State served Walker with a statement of facts detailing the evidence it intended to produce along with a revised witness list. (Doc. 92, Ex. 4). The court conducted a hearing on

various pretrial matters, including the similar transactions, on January 26, 1998. (Doc. 33). After hearing argument about the similar transactions, the court withheld ruling.

The matter came up again at the beginning of the State's opening statement, when counsel for both defendants objected to the prosecuting attorney's discussion of the events in Michigan and Tennessee. (Tr. 237, Doc. 70-3, p. 6). The court sent the jury out and conducted a lengthy conference with the attorneys concerning not only the similar transactions evidence, but also the redaction of Hope's statement. At the conclusion of this conference, the court stated

> As far as the transactions, I am inclined to allow them to come in.   I think it is - - **they are similar in some ways, there are indications that some one or more of the defendants**, and of course the other thing I'm going to do with the jury when they come back is to indicate that these defendants are not, even though they're being tried together and some of the things overlap, but they're going to have to make separate findings as to each one and that they need to listen carefully and be attentive to the fact that, you know, that they - - just because one might be found guilty of something doesn't mean another one has to be guilty of the same thing. And so I'm going to give them those - - those limiting instructions and also indicate that with regard to other acts or similar transactions which they may hear about or which may come into evidence, that **they are to consider those only for the purpose of identity, scheme, bent of mind, motive**, such as that as opposed to - - [interruption by prosecuting attorney]

(Tr. 250-51, Doc. 70-3, pp. 19-20) (emphasis added). The emphasized portions of the court's ruling indicate that the court had the three *Williams* factors in mind, but was sidetracked by thoughts regarding limiting instructions to the jury and was then interrupted by the prosecuting attorney. As such, the court's ruling is less than explicit.

The opinion of the Court of Appeals of Georgia, affirming Walker's conviction, does not indicate Walker raised the trial court's failure to make the *Williams* findings on direct appeal. Instead, it appears that Walker focused on the substance of the evidence, arguing that the evidence failed to show that Walker was the perpetrator of the alleged prior acts and that the prior acts were not sufficiently similar to the crimes with which Walker was charged in the indictment. Before addressing the substantive arguments, however, the Court of Appeals noted the procedural requirements of Uniform Superior Court Rule 31.3(B) and *Williams*:

> Before admitting similar transaction evidence, the trial court must hold a hearing where the State bears the burden of showing that the evidence of similar transactions is admissible under the three-prong test. [Citations omitted]. When reviewing the trial court's factual findings regarding whether the State satisfied the three-prong test, we apply the clearly erroneous standard. Further, the decision to admit similar transaction evidence which satisfies the three-prong test is within the trial court's sound discretion and will not be disturbed absent an abuse of that discretion.

*Walker*, 310 Ga. App. at 232. The Court of Appeals went on to consider the substance of the evidence and found that it was sufficient to show "that Walker was either the actual perpetrator or a party to the crimes," *id*., and that "some of the offenses committed during the co-conspirators' four-day, multi-state crime spree were, in fact, very similar to the indicted crimes and, therefore, relevant and admissible to demonstrate the co-conspirators' modus operandi, identity, bent of mind, and motive." *Id*. at 234.

Although the trial court may or may not have perfectly followed Georgia's procedures for admission of similar transaction evidence, nothing in the court's actions implicates Constitutional due process concerns. Walker had notice of the State's intent to present the evidence and a detailed

43

description of the substance of the evidence. Walker had an opportunity to object to the evidence in advance of trial and adequate time to prepare a response to the evidence.

The evidence was highly relevant to issues in the case, including, most importantly, the issue of identity. Because the victims, Mr. and Mrs. Allen, were unable to identify Walker positively, and because Walker was apprehended away from the scene of the crime, identity was his primary defense. Walker contends that he had nothing to do with the crime and that he was struck by a car while innocently attempting to cross Interstate 75. The similar transactions were highly probative of Walker's identity as the man who sat in the back seat of the Allen's Cadillac, in that it tied him closely to the two co-defendants and showed that he had participated in a series of acts that followed the same pattern. Because there was nothing fundamentally unfair in the admission of the evidence, Walker cannot show that his due process rights were violated.

## CONCLUSION

For the reasons set forth above, it is **RECOMMENDED** that Petitioner John O. Walker's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 be **DENIED**.

In addition, and pursuant to the requirements of Section 11(a) of the Rules Governing Section 2254 Proceedings, it does not appear that Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (explaining how to satisfy this showing) (citation omitted). Accordingly, it is **FURTHER RECOMMENDED** that the Court **DENY** a certificate of appealability in its final order.

Pursuant to 28 U.S.C. 636(b)(1), the parties may serve and file written objections to this Recommendation with the District Judge to whom this case is assigned WITHIN FOURTEEN (14) DAYS after being served with a copy thereof.

The parties are further notified that, pursuant to Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice. Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this recommendation with the district judge to whom this case is assigned, within fourteen (14) days after being served with a copy thereof.

**SO RECOMMENDED**, this 1st day of April, 2016.

s/ Charles H. Weigle
Charles H. Weigle
United States Magistrate Judge

45